In the Matter of The PRATT AND WHITNEY COMPANY, INC., Debtor.

John J. O'NEIL, Jr., Trustee, Plaintiff

v.

Mark S. SHIPMAN, Defendant.

Bankruptcy No. 2–91–00467. Adv. No. 2–91–0304.

United States Bankruptcy Court, D. Connecticut.

July 21, 1992.

See also 140 B.R. 327.

Gerald A. Del Piano, Francis, O'Neil, & Del Piano, Hartford, Conn., for plaintiff.

Jeffrey A. Blueweiss and David J. Robertson, Bai, Pollock & Dunnigan, Bridgeport, Conn., for defendant.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

### ISSUE

One day prior to filing a bankruptcy petition, a corporate debtor forwarded $100,000 to an escrow agent for the purpose of paying lawyers thereafter retained by the debtor's officers and directors if third parties sued them because of their status as the debtor's officers and directors. At issue in this proceeding is the question of entitlement to the present balance of the $100,000 as between the debtor's estate and the escrow agent. The matter has been submitted upon a stipulation of facts, documentary evidence and after a short hearing at which the debtor's former director of corporate finance and the defendant-escrow agent testified.

### II.

### BACKGROUND

The Pratt and Whitney Company, Inc. (the debtor), organized under the laws of

Ohio, had been a well-known and long-established designer and manufacturer of machine tools with its principal place of business in West Hartford, Connecticut. Westinghouse Credit Corporation (WCC) was the debtor's major lender under a $38,000,000 loan refinancing agreement dated May 24, 1989 (loan agreement) which granted WCC a first security interest in substantially all of the debtor's assets.

The debtor and WCC, on February 12, 1991, executed an agreement which provided that notwithstanding the debtor being in default on its obligations under the loan agreement, WCC would immediately advance $100,000 to the debtor to be used solely for the creation of a "Claims Fund" to pay for the defense of claims by third parties against the debtor's officers, directors, employees and agents asserted after January 29, 1991 and arising out of their employment status with the debtor. *Joint Exhibit 2.* The agreement noted that "Article IV of the Code of Regulations of the Company, as amended to date, provides for indemnification of directors, officers, employees and agents of the Company under certain circumstances to the maximum extent permitted under Ohio law...." and that "the Company ... would be unable to satisfy its indemnification obligations ... should a claim be asserted...." The agreement explicitly stated that the $100,000 advance "shall be treated as an advance of funds under the Loan Agreement and shall bear interest and be payable in accordance with the terms thereof."

On February 13, 1991, WCC wire-transferred the $100,000 to the debtor's bank account, and, on the same day, the debtor wire-transferred the $100,000 to Mark S. Shipman (Shipman), an attorney the debtor's counsel, Rogin, Nassau, Caplan, Lassman & Hirtle, (RNCL & H) had previously contacted. On the same day the debtor's board of directors voted that the debtor file a voluntary petition under chapter 11 of the bankruptcy code. The sole members of the debtor's board of directors were Richard R. Burkhart (Burkhart), Patrick J. Sullivan (Sullivan) and William B. Haggerty. Burkhart was the debtor's president and Sulli-

van its executive vice-president. The next day, February 14, 1991, the debtor filed its chapter 11 petition in this court.

Sullivan, as the debtor's vice president, sent Shipman a letter dated February 13, 1991, stating that the $100,000 wired to Shipman's office was an "advance payment for legal services on behalf of Pratt & Whitney employees, officers and directors ... to be placed in a segregated interest-bearing account and used only for the defense of actions which the Company would otherwise defend were it financially able under the terms of the Company regulations." *Joint Exhibit 1.* The letter further stated that the money was "to help enable us to retain certain key employees during the coming months ..." and "to remain available up to three years ..." after which time "the Board of Directors of Pratt & Whitney, or its designee, will advise you as to the disposition of any remaining funds."

Shipman responded by letter dated February 19, 1991 advising Sullivan that he had deposited the $100,000 in an account entitled "Mark S. Shipman, Escrow Agent," that he understood that "instructions for the disbursement of these funds will be received from you, from time to time," that the funds were "in escrow ... for the benefit of the officers and directors of Pratt & Whitney Company, Inc," and that "[a]dvises [sic] as to the disbursement of the funds may be made by phone and should be confirmed within 24 hours thereof in writing." *Joint Exhibit 3.*

The debtor, in its chapter 11 petition filed on February 14, 1991, asserted total assets of $44,305,065 and liabilities of $50,821,015. In the debtor's subsequently filed "Statement of Financial Affairs for Debtor Engaged in Business", Sullivan, on behalf of the debtor, replied "no" to the question of whether the debtor had made any transfers "not in the ordinary course of business during the year immediately preceding the filing of the original petition...." About four weeks later, on March 18, 1991, the debtor filed a motion to convert the case to chapter 7 and John J. O'Neil, Jr. was appointed the chapter 7 trustee.

The trustee, on August 19, 1991, wrote to Shipman stating that he had come across the $100,000 wire-transfer to Shipman and asked him to explain the circumstances of the transfer. On September 5, 1991, the trustee, by letter, made demand upon Shipman to return the $100,000 as it "is properly an asset of the Bankruptcy Estate which should not be disbursed without proper authority." *Joint Exhibit 11.* Shipman, by letter dated September 11, 1991 to the trustee, stated he was willing "to explain the $100,000 transfer, which were not funds of Pratt & Whitney...." *Joint Exhibit 9.*

The parties have stipulated that between April 1, 1991 and August 14, 1991 Shipman made six disbursements to four attorneys (including himself) totaling $31,427.50 in connection with the purposes of the escrow, and that on July 31, 1991 and August 2, 1991 third parties initiated lawsuits against Sullivan and Burkhart for actions taken as the debtor's directors and officers.

At trial, Julie Peck Harvey (Harvey), the debtor's former director of corporate finance, testified that the tax identification number given to Shipman to report the interest earned on the escrow account to the IRS was the debtor's number, and that she had certified to WCC, as required by the loan agreement, that there was loan availability based on the security held by WCC for the $100,000 to be transferred to the debtor. *Joint Exhibit 6.* Harvey also stated that, based on her experience as the debtor's director of corporate finance, the $100,000 transfer to Shipman was not an ordinary course of business transaction.

Shipman testified that the debtor had briefly hired him in November, 1990 for counseling about its financial difficulties and the possibility of a bankruptcy filing. On that occasion, he gave the debtor a list of law firms with bankruptcy court experience. RNCL & H was one of the firms listed. After November, he heard nothing until February, 1991 when he received a call from an RNCL & H attorney advising that WCC and the debtor's officers had selected Shipman to be an escrow agent. Shipman testified that the debtor's officers

and directors were then being threatened with lawsuits and that WCC agreed to the $100,000 transfer because WCC wished experienced management to remain with the debtor in order to safeguard WCC's loan collateral. Shipman accepted the $100,000 as an escrow agent, knowing a bankruptcy petition was under consideration. He notified both Sullivan and Burkhart of the trustee's demand letter, and they requested that he defend against any litigation brought to recover the escrow funds.

The trustee commenced the present proceeding against Shipman on November 8, 1991. The trustee's amended complaint contained four counts: (1) to seek turnover of estate property from a custodian under Code § 543; (2) to avoid a fraudulent transfer under Code § 548; (3) to avoid a postpetition transfer under Code § 549; and (4) to seek turnover of estate property under Code § 542. Both parties agree that this matter is a core proceeding. At the start of the trial the trustee withdrew the first count and all claim to the $31,427.50 disbursed by Shipman.

## III.

### DISCUSSION

Shipman's pre-trial brief asserted as a complete defense to all counts contained in the trustee's complaint that the funds delivered to Shipman never constituted funds of the debtor, but were property of WCC. "[T]he escrow fund was *not* 'property of the estate'; rather it was set up by Westinghouse to benefit certain Pratt & Whitney employees." (emphasis in the original) *Shipman's Trial Brief* at 9. Shipman during his testimony repeated this argument as the basis for his right not to comply with the trustee's demand.

Shipman's post-trial brief does not repeat the contention that the escrow account funds were received from WCC, but argues rather that the debtor's interest in this account was only that of holding legal title, citing Code § 541(d) ("Property in which the debtor holds ... only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the

debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."). "Though Pratt and Whitney may have retained a *'legal interest'* in the escrowed funds, it was the Pratt employees who held the *'equitable interest'*." (emphasis in the original) *Shipman Supplemental Brief* at 7.

To the extent that Shipman still maintains that the funds in his possession are funds of WCC, such contention is completely unsupported, implausible and requires no discussion. The $100,000 sent to Shipman came from the debtor's assets. Shipman's post-trial argument as to whether the escrow account remained property of the estate is a more credible contention, although still unavailing.

Under a test utilized by some courts for determining whether an escrow account is part of the debtor's estate, the nature and circumstances of the escrow agreement control. Factors courts have found relevant "in this determination include, but are not limited to, 'whether the debtor initiated and/or agreed to the creation of the escrow, what if any control the debtor exercises over it, the incipient source of it, the nature of the funds put into it, the recipient of its remainder (if any), the target of its benefit, and the purpose of its creation.'" *Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 567 (Bankr.N.D.Iowa 1990) (citing cases).

When the nature and circumstances of the Shipman escrow are reviewed, the monies are clearly property of the estate. On the day the directors voted to file a bankruptcy petition, they diverted $100,000 of the insolvent debtor's assets to fund contingent claims *they* hold against the debtor; they subsequently filed a bankruptcy petition which did not disclose the $100,000 transfer; the debtor retained exclusive control over disbursement of funds from the escrow; the result, if not the purpose of the fund, was to gain an advantage for the debtor's management over the claims of the debtor's other unsecured creditors. The cases relied upon by Shipman—*Dolphin Titan International, Inc. v. Gray &*

*Co., Inc. (In re Dolphin Titan International, Inc.)*, 93 B.R. 508 (Bankr.S.D.Tex. 1988) (debtor's motion to reject executory contract entered into 3 years previously to contribute to workers' compensation self-insurance fund denied); *In re Palm Beach Heights Development & Sales Corp.*, 52 B.R. 181 (Bankr.S.D.Fla.1985) ($12,600,000 deposited many years prior to bankruptcy petition by debtor with State of Florida to assure completion of road and drainage facilities not property of estate); *TTS, Inc. v. Citibank, N.A. (In re TTS, Inc.)*, 125 B.R. 411 (Bankr.Del.1991) (employee retirement fund created under employment contract created 14 years before bankruptcy petition not property of estate)—are all distinguishable and found inapposite.

■ As an alternative holding, the court concludes that even if the funds Shipman holds are not property of the estate, the trustee is entitled to avoid the $100,000 transfer to Shipman as a preferential transfer under Code § 547(b) (a transfer for the benefit of a creditor on account of antecedent debt where the debtor is insolvent made within 90 days of petition). The transfer would be a preference because of the Code's definition of claim, § 101(5):

> The definition [of claim] is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. . . . By this broadest possible definition, and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6266. *See also* S.Rep. No. 989, 95th Cong.2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5807–08. Accordingly, the debtor incurred a debt and the officers and directors held a contingent claim either when the debtor's

obligation to indemnify arose upon the later of the passage of the indemnification regulation and the officers' and directors' employment—*cf., e.g., In re M. Frenville Co., Inc.,* 744 F.2d 332, 336 (3rd Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985) ("When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement."), or at the time when the acts occurred giving rise to a reasonable likelihood of indemnification causes of action—*cf., e.g., In re Amfesco Industries,* 81 B.R. 777, 781 (Bankr.E.D.N.Y.1988) ("even though some of the elements necessary to constitute a cause of action have yet to occur, a 'claim' may exist under federal bankruptcy law provided there is a reasonable likelihood that there will occur within a reasonable time in the future those elements necessary to constitute a cause of action"). Under either scenario, the directors and officers held prepetition claims constituting an antecedent debt under Code § 547(b) on the date of the filing of the bankruptcy petition. The other elements of a preference are self-evident.

## IV.

## CONCLUSION

The trustee is entitled to a judgment that the defendant turn over to the trustee all funds presently in the bank account held in the name of Mark S. Shipman, Escrow Agent, No. 007–473–7016, at Fleet Bank, 101 Pearl Street, Hartford, Connecticut.[1]

---

1. For undisclosed and, to the court, not obvious reasons, the trustee on the record waived the estate's right to recover from Shipman the $31,-427.50 he distributed to attorneys after the trustee replaced Sullivan and Burkhart in controlling the debtor's assets. On April 4, 1991, at Sullivan's request, Shipman made an initial distribution of $1,750 to himself and $15,000 to the law firm of Wiggin & Dana. *Joint Exhibit 7. See* Code § 549.