**In re ANR ADVANCE TRANSPORTATION COMPANY, INC., Debtor.**

**Bankruptcy No. 99–22155–JES.**

United States Bankruptcy Court,
E.D. Wisconsin.

Feb. 25, 2000.

Brady C. Williamson, Timothy F. Nixon, La Follette Sinykin, LLP, Madison, WI.

Andrew Herbach, Howard, Solochek & Weber, S.C., Milwaukee, WI.

Steven E. Abelman, Berryhill Cage & North, P.C., Denver, CO.

## DECISION

### JAMES E. SHAPIRO, Chief Judge.

*PROCEDURAL BACKGROUND*

This case was commenced on February 2, 1999 upon the filing of an involuntary petition in bankruptcy in Delaware against ANR Advance Transportation Company, Inc. ("debtor"). On March 3, 1999, by stipulation of the debtor and the petitioning creditors, the case was transferred to the United States Bankruptcy Court for the Eastern District of Wisconsin. Bruce A. Lanser ("trustee") was appointed chapter 7 trustee.

The matter at hand involves a motion for relief from the automatic stay filed by Ringsby Terminals, Inc. ("Ringsby") which seeks recovery of certain funds totalling (as of June 30, 1999) approximately $241,-335.32 currently held in an account at Norwest Bank Denver, which Ringsby contends is an escrow account. Ringsby takes the position that it is entitled to these funds, together with continuing accrued interest, as partial reimbursement for its payment to the City of Oakland for environmental damage claims. Ringsby asserts that these funds are not property of the bankruptcy estate. The trustee opposes this motion and argues that the account where the funds are being held is not a valid escrow account because of the trustee's control over it and, therefore, these funds are property of the bankruptcy estate.

The parties agree—and this court concurs—that this dispute is ripe for disposition on summary judgment based upon the stipulated facts and briefs submitted. Although no formal motion for summary judgment was filed by either party, the court shall treat the pleadings as a joint motion for summary judgment.

*FACTS*

In March of 1986, ANR Freight System, Inc., a predecessor to the debtor, leased a freight terminal in Oakland, California ("Port of Oakland freight terminal"), from Dongary Investments, Ltd., a Colorado corporation (now known as Ringsby). During the lease period, underground storage tanks, which also had been leased to the debtor, were alleged to have caused substantial environmental contamination. In June of 1992, Ringsby and the debtor entered into a "Termination of Lease and Release" agreement. Paragraph 5 of this agreement declares that the parties shall jointly deposit funds into "an interest bearing escrow account to be established at Norwest Bank Denver, NA" ("bank") for the purpose of paying for the costs of removing the storage tanks and for remediation attributable to the tanks. Under the terms of this agreement, Ringsby deposited $300,000 and the debtor deposited $230,000 with the bank.[1] The agreement established a procedure for making disbursements from this account for payment for the clean-up costs. Approximately $290,000 was disbursed for such removal of tanks and remediation.

After this agreement was entered into, the Port of Oakland, while in the process of removing its tanks located on adjacent property, discovered that contamination existed which was alleged to have come from the Port of Oakland freight terminal. Environmental investigations discovered contamination from diesel fuel, gasoline and gasoline by-products, MBPE's, benzine, and other contaminants. As a result, the Port of Oakland sought recovery from Ringsby in an amount exceeding $1,457,-000 together with attorneys' fees of $500,-000. On June 29, 1999, Ringsby entered into an agreement with the City of Oakland to settle the dispute by paying $850,-000 in full settlement, which sum Ringsby in fact paid with the expectation that it would be partially reimbursed for such payment from the funds remaining in the account at the bank.

---

1. Although the stipulation of facts states that the debtor deposited $230,000 into this account, ¶ 5 of the agreement states that the debtor was credited with an additional $70,-000 resulting from prior contributions.

The issue is whether the document entitled "Escrow Agreement" is a true escrow agreement. The parties do not dispute the legal consequences if the agreement is found to be a true escrow. If that is the case, the funds remaining in the escrow account are not property of the bankruptcy estate. On the other hand, if it is found that there is no valid escrow account, then one-half of these funds, representing the debtor's contribution, constitutes property of the estate.

## LAW

■ The debtor's right in property, including its nature and scope, is determined by state law. *See Butner v. U.S.*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979). Paragraph 4.02 of the "Escrow Agreement" declares that the agreement shall be construed under Colorado law. What little law exists in Colorado having a bearing on this issue is set forth in *Weigel v. Hardesty*, 37 Colo.App. 541, 549 P.2d 1335 (1976), where the court states the following:

> An escrow relationship is essentially a three party contract. Generally it arises in the first instance by agreement between two parties concerning the delivery of an instrument upon the occurrence of a specified future condition. The instrument is thereafter deposited, by separate agreement, with an independent third party with instructions concerning its ultimate delivery.

■ But the question of whether such interest is "property of the estate" within the meaning of § 541 of the Bankruptcy Code, is determined by federal law. *See Fisher v. Apostolou*, 155 F.3d 876, 880 (7th Cir.1998). Although "property of the estate" for purposes of § 541 is afforded a broad interpretation, it is not without its limits. In *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 8, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), the United States Supreme Court stated that the legislative history of § 541 of the Bankruptcy Code demonstrates a Congressional intent to exclude property in which the debtor holds only a minor interest from becoming prop-

erty of the estate. "[A]n interest limited in the hands of a debtor is equally limited in the hands of the estate." *In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir.1985). *See also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (1984) ("whatever rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less"). The "[f]iling of a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds the interest." *In re Sanders*, 969 F.2d 591 (7th Cir.1992).

■ The thrust of the trustee's challenge here is not whether the funds in a valid escrow account constitute property of the estate. Rather, the trustee's contention is that no valid escrow account was ever created. It is the trustee's position that there was control by the debtor (and now by the Chapter 7 trustee) over these funds, thereby precluding the account from constituting a true escrow account. If there is no escrow, then, pursuant to paragraph 6 of the "Termination of Lease and Release," one half of the balance in this account is property of the estate.

■ An escrow is the deposit of property by a grantor or grantors with a third party to be held by that third party "until the performance of a condition or the happening of a certain event, and then to be delivered over to the grantee" upon the happening of the event. 28 Am.Jur.2d *Escrow* § 1 (1966); *see also Black's Law Dictionary* (7th Ed.).

> No precise form of words is necessary to constitute an escrow. The term "escrow" need not even be used. Merely labelling a specific delivery of property as an escrow does not make it such, nor will the misuse of that term in designating an instrument necessarily make it an escrow. However, the use of the term is a circumstance to be considered in arriving at the intent of the parties.

28 Am.Jur.2d Escrow § 3. For a valid escrow to exist, the delivery of the proper-

ty to the third party must be irrevocable. *See* 28 Am.Jur.2d Escrow § 8. There is no escrow if a grantor retains the right to revoke the agreement. *See Matter of O.P.M. Leasing Services, Inc.*, 46 B.R. 661, 667 (Bankr.S.D.N.Y.1985); Thomas M. Byrne *Escrows and Property* 48 Bus. Law. 761, 762 (1993).

Whether the account in which the funds are held is a true escrow account demands a careful analysis of the documents in this case—namely the "Termination of Lease and Release" agreement between Dongary and ANR Freight Systems, Inc. and the companion "Escrow Agreement" between these parties and Norwest Bank Denver, NA. The language in both documents is replete with terms strongly suggesting that an escrow agreement was intended to be created by the parties. Paragraphs 5 and 6 of the "Termination of Lease and Release" contain numerous references to an "escrow account" and "escrow agent." Paragraph 5 of this document also states that "neither party shall have title to the monies in escrow." The companion "Escrow Agreement" also contains numerous references to "escrowed property" and "escrow agent."

Nothing in this case indicates that the purpose of placing these funds in this account was to gain advantage over claims of unsecured creditors or was in anticipation of a bankruptcy petition. That was the scenario in *Matter of Pratt and Whitney Co., Inc.*, 143 B.R. 19 (Bankr.D.Conn.1992) where the debtor set up a $100,000 purported escrow on the same day that its board of directors voted to file a Chapter 11 petition. That is in sharp contrast to what occurred in *In re Palm Beach Heights Development & Sales Corp.*, 52 B.R. 181 (Bankr.S.D.Fla.1985) where funds were placed in an account which purported to be an escrow, years before a bankruptcy petition had been filed. In *Palm Beach Heights*, the court concluded a valid escrow was established, unlike *Pratt and Whitney* where the court concluded a valid escrow was not established. The circumstances in the case at bar are much closer to those in *Palm Beach Heights*. In the

instant case, the account was created in June of 1992—more than six years before the bankruptcy petition was filed. Moreover, the bankruptcy petition in this case is an involuntary petition.

The most crucial factor bearing upon the issue before this court is the question of control on the part of the debtor. "Perhaps the clearest requirement of an·escrow is that the grantor (depositor) part with 'dominion and control' over the deposited funds." Mark C. Young: *Escrow Agreements* Wis. Bar Bull. Sept. 1985, at 29. The trustee argues that the debtor in this case held a "veto power" over the disbursement of the funds, thereby maintaining the prerequisite "control" needed to destroy the purported escrow agreement. The court rejects that contention. Paragraph 6 of the "Termination of Lease and Release" states:

> Invoices from the Contractor will be submitted simultaneously to both Lessor and Lessee. The parties agree that any objection by either party to any invoice will be made in writing by facsimile transmission to the other party and to the Contractor within ten (10) business days of the receipt of such invoice. If no written objection is made, Lessee and Lessor shall promptly jointly instruct the escrow agent to pay the invoice. Should any disagreement arise between the parties concerning the payment of any invoice, the Lessee and Lessor shall instruct the escrow agent to pay any portion of the disputed invoice about which the parties agree. The parties will attempt, in good faith, to resolve any disagreement regarding all or any portion of a disputed invoice.

Schedule B(2) of the "Termination of Lease and Release" states:

> (2) *Disbursals.* The Escrow Agent shall make disbursements from the escrow account in accordance with the written instructions signed by either Donald W. Ringsby or Eldon C. Yeutter on behalf of Dongary Investments Ltd. and signed by either Stephen R.

McKemy or Walter Hwozdyk on behalf of ANR Freight System, Inc.

These provisions do not establish an absolute "veto power" on the part of the debtor. What they created was a limited right by the debtor to review the contractor's invoices in connection with the costs of removal of the storage tanks and remediation in order to determine if the work was properly performed and if the invoices were reasonable. That is not the type of "control" which would destroy an escrow agreement. In *Garrott & Sons,* 772 F.2d 462, 466, the district court held that the entire fund in an alleged escrow account was property of the estate because the debtor retained certain rights—namely, the right to receive surplus proceeds and also the right to require that the funds in that account to be used to pay certain Connecticut mortgages. The district court's decision was reversed on appeal where it was held that this limited interest in the hands of the debtor did not make all of these funds property of the estate. *Garrott & Sons,* 772 F.2d at 466.

Similarly, the duty of a debtor to co-sign checks form an escrow account was not the type of control sufficient to invalidate an escrow account. *See In re Dolphin Titan International, Inc.,* 93 B.R. 508 (Bankr.S.D.Tex.1988). In coming to its decision, the court in *Dolphin,* noted that the debtor did not have a right to withdraw the funds from the account at will. *See Id.* at 512. It is the right to withdraw funds and the right to revoke the agreement which are required to constitute the control necessary to invalidate an escrow agreement. The documents in this case do not provide for such rights on the part of the debtor.

## CONCLUSION

This court holds that a valid escrow agreement was created by the parties. "To come to any other conclusion would contradict the plain meaning of the contracts and give [the debtor] a windfall." *FDIC v. Knostman,* 966 F.2d 1133, 1141

(7th Cir.1992). The funds in this account are not property of the bankruptcy estate.

Summary judgment is **GRANTED** in favor of Ringsby, and Ringsby is not stayed from seeking recovery of the escrowed funds held in the account at Norwest Bank Denver. The trustee shall execute such documents as may be required in order to effect the disbursement to Ringsby of all of the remaining escrowed funds.